

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CASE NO. 1:06-CR-125(9)** |
| | § | |
| **ANTHONY JERMON LEE,** | § | |
| *Defendant.* | § | |

## FINDINGS OF FACT AND RECOMMENDATION
## ON MOTION TO SUPPRESS

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, by order of the District Court[1], this matter was referred to the undersigned magistrate judge for a hearing and the submission of findings of fact and a report and recommendation on Defendant's *Motion to Suppress Physical Evidence* [Clerk's doc. #229].

### A.    Defendant's Motion to Suppress Physical Evidence

Defendant, hereinafter referred to as "Lee" filed his *Motion to Suppress Physical Evidence* on March 12, 2007. [Clerk's doc. #229].  In his motion, Lee seeks to suppress all physical, documentary, oral statements, and other evidence seized in connection with the stop and search of his person and vehicle in that the stop and search of his vehicle was without a warrant and without

---

[1]    *See Order* referring motion [Clerk's doc. #252].

probable cause.  Specifically, Lee contends as follows:  no probable cause existed for the initial stop; the traffic stop was a pretext; there was no reasonable suspicion to justify a *Terry* stop; no justification existed for the search of the vehicle, or, in the alternative, the scope and duration of the investigative detention was excessive and not justified; consent to search was not voluntary, or in the alternative, exceeded the scope; no probable cause existed for the warrantless search of the vehicle; the search and seizure exceeded the permissible scope under *Terry v. Ohio*; and, the detention became unreasonable after a check of his driver's license and insurance was complete.

In his motion, Lee also argued that statements made by him should be suppressed because they were in violation of *Miranda v. Arizona* and that the statements were involuntary of the result of pressure or coercion by law enforcement agents and therefore in violation of Title 18, United States Code, Section 3501.[2]

### B.   The Government's Response in Opposition to Defendant's Motion to Suppress

On March 19, 2007, the Government filed it's *Government's Response in Opposition to Defendant's Motion to Suppress* [Clerk's doc. # 231].  In its response, the Government contends that Lee was stopped for several violations of Texas traffic laws.  According to the Government, Lee freely and voluntarily consented to a search of his tractor-trailer after the arresting officer reviewed his driver's log book.  The Government also argues that any statements which were made were given subsequent to Lee being given his *Miranda* warning.  The Government further contends that, separate and apart from the traffic stop, another basis existed for the stop and detention of Lee,

---

[2]      Upon review of the evidence, this Court noted that Lee's six (6) post-arrest statements were exculpatory in nature. This Court contacted the attorney for Government and the attorney representing Mr. Lee in this case.  The attorney for the Government represented to the Court that it did not intend to introduce the post-arrest statements at trial.  Mr. Lee's attorney requested that the Court not consider the admissibility of the statements in its ruling concerning the motion to suppress.  Therefore, this Court will not address the admissibility of the post-arrest statements in this opinion as they are moot based upon the parties' communications to the Court.

that is, the interception of his conversations in a court-authorized wire intercept and his conduct while under surveillance by Drug Enforcement Administration (DEA) agents in Houston, Texas.

On April 12, 2007, the Court conducted a hearing on the suppression motion in the manner and form mandated by the Federal Rules of Criminal Procedure.  Having heard the evidence, the Court recommends the motion be denied.

### C.     Facts adduced at the suppression hearing

During the month of March 2006, Houston DEA agents were involved in an investigation which involved the use of a court-ordered Title III wire intercept.  During the investigation, agents determined that the main target of the investigation, an individual identified as Thomas Miller, commonly utilized tractor-trailers to transport cocaine from the Houston, Texas area to other locations in the United States.  Miller or various associates would meet with the driver of the tractor-trailer, pass the cocaine to them, and maintain contact with them via cellular telephone during the transportation of the narcotics.  In March 2006, agents intercepted conversations of members of the organization which led to the seizure of thirty (30) kilograms of cocaine and one (1) kilogram of heroin which was secreted in a tractor-trailer to be transported from Houston, Texas to St. Louis, Missouri.[3]

On March 28, 2006, one week after the seizure described above, DEA agents intercepted a conversation between Miller and Lee in which the two men discussed the transportation of cocaine.  Subsequent conversations were also recorded.  As a result, DEA agents initiated surveillance on Lee at a Home Depot parking lot located in Houston, Texas.  During the surveillance, agents observed a tractor-trailer and a silver Dodge Magnum in the Home Depot

---

[3]     Lee was not involved in this seizure.

parking lot.  Later that night on March 28th, DEA agents followed Lee as he drove the Dodge Magnum to a Shell station in Houston and observed him meet with Miller at that location.  During this time, agents monitoring the wire overheard Miller and an individual later identified as James Jackson, Jr. discussing the delivery of cocaine.  Agents then observed Jackson drive into the parking lot of the Shell station and park in close proximity to the vehicles driven by Miller and Lee. Jackson was observed removing black bags out of his vehicle and placing them in the rear of the Dodge Magnum.  The bags appeared to contain items.  Based on the content of the intercepted telephone conversations and the knowledge of Miller's utilization of tractor-trailers to transport cocaine, the agents were confident that the black bags contained cocaine.

DEA agents observed Jackson depart in his vehicle and the agents followed Lee as he drove the Dodge Magnum back to the parking lot of the Home Depot and parked next to the tractor-trailer. Agents then saw Lee remove one of the black bags from the Magnum and carry it to the passenger side of the tractor-trailer.  Houston DEA Agent Rob Cash telephoned Sgt. Greg Fountain who, at that time, was employed as a patrol deputy/narcotics officer with the Jefferson County Sheriff's Department.[4]  Cash informed Fountain that Houston DEA agents were monitoring a wiretap and were presently conducting surveillance on Lee and his tractor-trailer.  Cash told Fountain about the seizure of the thirty (30) kilograms of cocaine from the wiretap which occurred the week before and the Houston agents were presently observing similar activity.  Cash told Fountain that agents had observed Lee enter his tractor-trailer with a large black duffle bag.  Cash stated that he believed that there was probable cause that the duffle bag contained cocaine due to the content of the intercepted

---

[4]    Fountain is presently employed as the Emergency Management Coordinator in Jefferson County, Texas.  At the time of this incident, he was an eighteen (18) year veteran of law enforcement with approximately seven (7) years experience in narcotics and patrol divisions.  He has attended numerous schools relating to narcotics enforcement and served as an instructor in drug interdiction.

phone conversations and Lee's actions which the agents observed while on surveillance.[5]  Cash

informed Fountain that he would contact him (Fountain) if the tractor-trailer headed east on

Interstate 10. Agents continued surveillance on Lee and the tractor-trailer throughout the night of

March 28th.

Early the next morning, agents observed the tractor-trailer leave the parking lot of the Home

Depot and travel east on Interstate 10.  Cash telephoned Fountain at approximately 6:30 a.m. that

morning and informed Fountain that the Houston DEA agents were following the tractor-trailer as

it traveled east.  Cash requested that Fountain stop the tractor-trailer and attempt to obtain Lee's

consent to search it.  Cash provided Fountain with a description of the Lee's vehicle[6].  As the truck

proceeded eastbound on Interstate 10, Houston DEA agents monitoring the wiretap intercepted a

conversation between Miller and Lee.   Miller was apparently checking on Lee and asked if

"everything was cool".  From their investigation, Houston DEA agents knew that Miller commonly

kept in touch with his couriers during their travels with the narcotics.  Cash stayed in contact with

Fountain as the Lee's truck approached Jefferson County.

Shortly thereafter, Fountain observed Lee's truck as it passed Fountain's stationary position

on Interstate 10.  Fountain clocked the truck at 75 m.p.h. in a 70 m.p.h. zone with his stationary

radar.[7]  Fountain also observed that the tractor-trailer was following other vehicles too closely and

---

[5]    Fountain testified that Cash specifically told him that Houston agents has intercepted several telephone conversations between Lee and the main target discussing the transportation of a load of cocaine.  Fountain stated that Cash told him that agents observed Lee loading the large black duffle bag into his truck which appeared to be extremely heavy and that the agents believed that Lee was placing the cocaine into a natural void of a false compartment in the tractor-trailer.

[6]    Fountain was given the color of the tractor-trailer and advised that it has the word "XTRA" appearing across the back door of the trailer.  He was also provided with the numbers appearing on the tractor and the license plate numbers on the trailer. Although the numbers apparently matched, Fountain's report indicated that the trailer had an Indiana license plate while the DEA report indicated that the trailer had a Louisiana license plate.

[7]    Fountain also "paced" the tractor-trailer and confirmed its speed as 75 m.p.h.

that it failed to signal lane changes.  Fountain activated his dash-mounted camera system and emergency lights and attempted to stop Lee's truck.[8]  Fountain observed Lee tap his brakes and activate his turn signal which indicated to Fountain that Lee was aware of Fountain's attempt to get him to stop the vehicle.  Lee failed to immediately stop and drove another 1 - 1 ½ miles before he stopped the truck, which caused Fountain to comment on the audio that it was taking Lee a long time to pull the vehicle over.[9]

Fountain made then made contact with Lee at the rear of the tractor-trailer.  According to Fountain, Lee was very fidgety and very nervous.  Fountain asked for and received Lee's driver's license and chastised Lee for failing to timely stop his vehicle.  Fountain inspected Lee's log book and determined that it was not properly updated.  Upon questioning, Lee admitted that he had a prior misdemeanor arrest for marijuana in 1995.  Fountain noted that Lee would not stand in one spot and told Lee that he (Lee) was making him (Fountain) nervous.[10]  Fountain then decided to ask Lee for consent to search the vehicle.  Fountain felt that several factors existed separate and apart from the information received from the DEA agents which aroused his suspicions.  Fountain felt that Lee's delay in stopping the truck; his nervous demeanor at the scene; his previous marijuana arrest; and his (Fountain's) knowledge that Houston is a major source city for narcotics with Interstate 10 being a corridor for the transportation of narcotics were factors which led him to suspect that Lee may be trafficking narcotics.  Taken in conjunction with the information received

---

[8]    The traffic stop was recorded and a DVD of the stop was admitted as Government's Exhibit #1.

[9]    Lee eventually exited Interstate 10 at the Smith Road exit, traveled down the service road, and came to a stop near the middle of the service road.  Testimony indicated that Lee's radio was playing loudly at the time of the traffic stop and he may not have heard the siren on Fountain's patrol car.

[10]    Fountain patted Lee down and received consent to search his pockets.

from Houston DEA, Fountain decided to ask Lee for consent to search his vehicle.

According to Fountain, Lee verbally consented and gestured toward the tractor-trailer.  At this point in time Fountain still had Lee's driver's license and had not yet requested a computer check.  Fountain testified that he never called for the computer check because he decided to ask for consent after speaking with Lee about the log book violations.

Sgt. Tony Viator then arrived on the scene.  Fountain handed Lee's log book to Viator and Viator stood next to Lee at the rear of the truck while Fountain proceeded to search the cab of the tractor.[11]  Within the first few minutes of the search, Fountain located two false compartments in the cab of the tractor located near the closet area.  The compartments were constructed out of sheet metal and Fountain had encountered these types of compartments previously.  Utilizing a fiber optic probe, Fountain determined that the compartments were empty.

Fountain then used a density meter in the area of the tractor behind where the speakers were mounted and obtained readings which were higher than expected, indicating the presence of contraband behind the speakers.  Fountain used a screwdriver to remove the speaker and discovered approximately twenty (20) kilograms of cocaine in the area behind it.  Fountain also discovered an empty black duffle bag in the cab of the truck.

Fountain walked back to the patrol car and handcuffed Lee, advising him that he was under arrest.  Fountain asked Lee about the cocaine and Lee stated that he knew nothing about any cocaine.  Fountain then gave Lee his Miranda warnings and Lee indicated that he understood those warnings.  Lee again stated that he did not know anything about the cocaine.

---

[11]     At some point in time Viator placed Lee in the backseat of one of the patrol cars and Viator assisted Fountain in searching the truck.  According to Fountain, this occurred after the discovery of the false compartments.

### D. **Analysis**

#### 1. **Analysis under *Terry v. Ohio***

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. AMEND. IV.   Traffic stops are deemed seizures for the purposes of the Fourth Amendment. *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001).  The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  *See Knowles v. Iowa*, 524 U.S. 113, 117, 119 S. Ct. 484, 142 L. Ed.2d 492 (1998); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984).  Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868.

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005), *cert. denied* 546 U.S. 1222 (2006).  "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981)).  The Fifth Circuit has stated that reasonable suspicion exists when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *See, e.g., United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002).  In

–8–

evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvisu*, 534 U.S. at 274, 122 S.Ct. 744.  In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice.  *Terry*, 392 U.S. at 27, 88 S.Ct. 1868.  It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.  *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744.

As for the second prong of the *Terry* inquiry**,** generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop ..."  *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004)(en banc).  In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle is stolen.  *Id.* at 507-08.  An officer may also ask the driver about the purpose and itinerary of his trip.  *Id.* at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop since "[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed."  *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)).  Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter prolongs the detention. *Brigham*, 382 F.3d at 510; *see also Santiago*, 310 F.3d at 341-42; *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000); *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999).  A recognized exception to that rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.  *See Brigham*, 382 F.3d at 507; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003), *cert. denied* 540 U.S. 1227 (2004).

### a. <u>The initial stop</u>

From the outset, the Government has the burden of proving that a warrantless stop and seizure comports with the Fourth Amendment. *See United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995). A motorist's expectation of privacy yields to a routine traffic stop for such violations as speeding or changing lanes without signaling. *United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir. 1993),*cert. denied* 510 U.S. 1204.

This Court must now examine Texas law to determine whether Lee's actions did in fact constitute violations of Texas traffic laws. As stated above, Lee was stopped for speeding, failure to signal a lane change, and following too closely to another vehicle. This Court must first determine whether these acts are in violation of Texas traffic laws. Under Texas law, 60 m.p.h. is the maximum daytime speed that a tractor-trailer may travel on a U.S. interstate highway during the daytime and 55 m.p.h is the maximum speed during the nighttime hours. *See* Tex. Transp. Code § 545.352(4)(c) (Vernon 1999). In addition, the operator of a motor vehicle must signal an intention to turn or to change lanes. *See* Tex. Transp. Code § 545.104(a) (Vernon 1999). Finally, an operator of a motor vehicle must maintain an assured safe distance while traveling behind the vehicle immediately in front of him. *See* Tex. Transp. Code § 545.062(a)(Vernon 2005). This Court finds that the alleged violations are violations of Texas traffic laws. Accordingly, there was an objective basis for the traffic stop of Lee's tractor-trailer.

Sgt. Fountain testified that he clocked Lee's vehicle on radar traveling 75 m.p.h. and was following another vehicle too closely. He further testified that he also "paced" the tractor-trailer to confirm that speed.[12] He also testified unequivocally that Lee changed lanes without signaling.

---

[12] Fountain noted on tape once the camera was activated that the truck was "running 75" and "tailgating".

This Court finds Deputy Fountain to be credible and finds that there was a justifiable reason to stop Lee's tractor-trailer for speeding, following too closely, and failing to signal a lane change.

Lee's contention that this "pre-text" traffic stop is in violation of his Fourth Amendment rights is not persuasive.  Police officers are allowed to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop.  *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

### b.  the detention

Once Lee's tractor-trailer was lawfully stopped, Fountain had the right to converse with Lee about who owned the vehicle, his destination, etc.  Simple questioning, even on a subject unrelated to the purpose of the stop, is not a Fourth Amendment violation.  *Shabazz*, 993 F.2d at 436.   It appears that immediately after Lee exited his vehicle, Fountain requested Lee's driver's license and told him about the reason for the traffic stop.[13]  Fountain then inquired about Lee's destination and any prior arrests.  After telling Lee that he appeared to be very nervous and receiving consent to pat him down, Fountain requested to see Lee's log book.  At this point, only 2 ½ minutes had elapsed.

Fountain's request to see the log book was reasonable.  The Fifth Circuit Court of Appeals has noted that the commercial trucking industry is governed by extensive federal and state regulations.  *See United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001), *cert. denied* 534 U.S. 977 (2001).   Considering the commercial nature of Lee's vehicle, and the fact that Fountain had knowledge of Lee's conversations and activities in Houston, it was reasonable for Fountain to

---

[13]     This Court has reviewed the videotape of the traffic stop admitted into evidence and will refer to the time indicated on the screen.

request to see the log book.[14]  *See United States v. Munroe*, 143 F.3d 1113 (8th Cir. 1998).

After noticing that Lee's log book was not complete, Fountain requested and received Lee's consent to search.  At this point, between five and six minutes had elapsed since Fountain initially spoke with Lee.   Lee argues that Fountain improperly held his driver's license and did not immediately begin a records check before consent to search was granted.  However, there is no requirement that officers immediately initiate the computer check before they question the occupants of the vehicle.  Further, the Fifth Circuit Court of Appeals has held that there is no constitutional stopwatch on traffic stops.  *Brigham*, 382 F.3d at 511.  The relevant question in assessing whether a detention extends beyond a reasonable duration is whether the officer diligently pursued a means of investigation to confirm or dispel his suspicion quickly.  *Id.*

In *Brigham*, the *en banc* Court held that the police officer's actions in delaying the records check for seven minutes while he questioned the occupants of the vehicle was reasonable because it exemplified a graduated response to the emerging facts which had been ascertained by the police officer.  *Id.* at 509.  In this case, Fountain had received information from Houston DEA agents regarding Lee's intercepted telephone conversations and his actions as observed by the agents conducting surveillance in Houston.  This, combined with his nervousness, his admission of a prior drug arrest, and Fountain's experience with Houston and Interstate 10, certainly would provide Fountain with suspicion to believe that Lee could be transporting narcotics.  Fountain's inspection of Lee's log book would show Lee's previous travels which would possibly confirm or dispel Fountain's suspicions.

---

[14]     Fountain testified that he could not issue a ticket or take the truck out of service because he was not a DOT certified officer.  However, he testified that he could contact a Texas Department of Public Safety (DPS) trooper or City of Beaumont police officer who is certified to issue a ticket or otherwise deal with the log book violation.

Even assuming that Fountain's investigation of the traffic offense should have concluded in the five to six minutes between the first contact with Lee and the receipt of Lee's consent to search, this Court finds that Fountain had reasonable suspicion to detain Lee to investigate the possible narcotics offense. A Fourth Amendment violation occurs if the detention extends beyond the valid reason for the stop. *Santiago,* 310 F.3d at 341-42. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, in other words, the traffic stop is concluded, the driver should be free to leave. *Id.* To continue a detention after this point, an officer must be able to point to specific articulable, reasonable facts (reasonable suspicion) suggesting that a crime has been or is afoot. *Grant,* 349 F.3d at 196.

When making reasonable suspicion determinations, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspected legal wrongdoing. *Grant,* at 197. Officers are allowed to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *Id.* at 197. Courts should err on the side of deferring to the knowledge and experiences of a trained law enforcement officer's ability to distinguish between innocent and suspicious activities. *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Notwithstanding, Fourth Amendment activities are to be judged in the light of objectively justifiable factors, not a law enforcement officer's subjective motives. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 210, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Therefore, the officers involved must be able to articulate something more than just an unparticularized or inchoate hunch. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Although the showing required to demonstrate reasonable suspicion

is considerably less than what is necessary to establish probable cause, the Fourth Amendment requires only some minimal level for an officers actions, measured in light of the totality of the circumstances. *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (citing *Sokolow*, 490 U.S. at 6-8, 109 S.Ct. 1581). The analysis of reasonableness of factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. *United States v. Ibarra-Sanchez,* 199 F.3d 753, 759 (5th Cir. 1999). Courts should look at the totality of the circumstances to discern whether the officers involved were presented with a "particularized and objective basis" for the suspected wrongdoing. *Arvizu,* 534 U.S. at 273. The Supreme Court instructs lower courts not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances. *Lopez-Moreno,* 420 F.3d at 433.

The Fifth Circuit Court of Appeals has recognized that mere "uneasy feelings" and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. *See Santiago,* 310 F.3d at 338-39. They have also held that reasonable suspicion did not exist merely because the defendant was nervous and there was confusion as to the renter of the vehicle and inconsistent answers about travel plans. *See Dortch,* 199 F.3d at 200.

As stated above, Fountain felt that several factors existed separate and apart from the information received from the DEA which aroused his suspicions. Lee's alleged delay in stopping the truck; his nervous demeanor at the scene; his previous marijuana arrest; and Fountain's knowledge that Houston is a major source city for narcotics and that Interstate 10 is a corridor for the transportation of narcotics were factors which led him to suspicion that Lee may be trafficking narcotics. In addition, Fountain received specific information from the DEA agents about the

contents of Lee's intercepted telephone conversations and information that Lee was observed

loading a duffle bag which the agents believed to contain contraband into the cab of his truck.  This

certainly provided Fountain with much more than a "hunch" that Lee was transporting narcotics.

Therefore, this Court finds that Fountain has ample reasonable suspicion to detain Lee to investigate

the narcotics offense and this reasonable suspicion continued for a long as it took to diligently

pursue a means of investigation that was likely to confirm or dispel his suspicion.  *United States*

*v. Hare,* 150 F.3d 419, 426 (5th Cir. 1998) (overruled on other grounds); *United States v. Doggett*,

230 F.3d 160, 163-64 (5th Cir. 2000), *cert. denied* 531 U.S. 1177 (2001).  In conclusion, because

Fountain was still investigating the traffic offense at the time he received consent to search the

tractor-trailer, the detention at that point continued to be supported by the facts that justified its

intrusion and, therefore, was lawful.  If, as Lee seems to argue, Fountain had no right to inspect the

log book and Lee was illegally detained for approximately three minutes while Fountain questioned

him about the book, this Court finds that Fountain had reasonable suspicion to detain Lee to

investigate the possible narcotics offense by requesting consent to search.

### c.  voluntariness of consent to search

A search conducted pursuant to consent is one of the well-settled exceptions to the Fourth

Amendment's warrant requirement.  *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997),

523 U.S. 1036 (1998). This Court must now determine whether Lee's consent to search was

voluntary.

Voluntariness is determined from the totality of the circumstances surrounding the search.

*Id.*  To determine whether consent was validly given, we ask whether consent was voluntary and

whether it was an independent act of free will.  *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir.

2006).  In determining whether the consent was voluntary, the Court considers: (1) the voluntariness of Lee's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of Lee's cooperation with the police; (4) Lee's awareness of his right to refuse consent; (5) Lee's education and intelligence; and (6) Lee's belief that no incriminating evidence will be found.  *Id.* The Government bears the burden of proving that consent was voluntary.  *Id.*  Although all the factors are relevant, none are dispositive.  *United States v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir. 2007).

As to the first factor, it was apparent that Lee was never free to go during the traffic stop. There is no indication that his driver's license was returned to him and, at one point during the search after the false compartments were discovered, Lee was placed in the backseat of the patrol car.  Fountain also admitted during cross examination that Lee was never free to leave.  Therefore, this factor weighs against the Government.

Although Fountain initially raised his voice to Lee at the beginning of the traffic stop[15], a review of the testimony and the videotape does not reveal any coercive police procedures.  There were no threats, promises, or coercion by Fountain.  In addition, during the traffic stop, Lee appeared to be very cooperative.  He obeyed requests and appeared polite.  Therefore, factors two and three weigh for the Government.

However, Fountain did not inform Lee that he had a right to refuse consent, and this weighs against the Government.  Lee's actions and responses during the traffic stop and captured on video do not indicate that he lacked the education or intelligence to understand that he was giving

---

[15]     Fountain clearly appeared to be somewhat agitated at Lee for failing to promptly pull over and demanded to see Lee's driver's license.  However, Fountain also testified that he spoke loudly because of the road noise and due to his own hearing difficulties.  There was no testimony or other evidence that Lee was threatened or intimidated.

Fountain consent to search his tractor-trailer.  See *Arias-Robles,* 477 F.3d at 249 (finding that defendant had a commercial license, maintained a log book, and obviously understood the purpose of the stop relevant to the determination of this factor).  Lee appropriately responded to Fountain's questions and stated that he had been driving a truck for several years.  In fact, Lee admitted on videotape after the discovery of the cocaine that he had an 11th grade education and could read and write.

Due to the fact that the cocaine was secreted in the area behind the speakers, Lee could certainly believe that no incriminating evidence would be found.  Again, this factor is also in the Government's favor.

Looking at all of the factors, viewing the videotape, and examining the totality of the circumstances, this Court concludes that consent was voluntarily given.[16]  When Fountain requested consent to search, Lee stated, without hesitancy, "be my guest".  The consent was an independent act of free will.

---

[16]    Fountain acknowledged during cross examination that Lee was placed in the patrol car by Viator after the discovery of the hidden compartments and was not available to the officers should he decide to revoke his consent.  However, Fountain testified that Lee never attempted to revoke or limit the scope of his consent and no evidence to the contrary was introduced.  Further, there is no requirement that law enforcement officers conduct all searches in plain view of the suspect so that he may withdraw or delimit his consent during the search.  *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (citing *United States v. Rich*, 992 F.2d 502, 507 (5th Cir. 1993)).

### d.  <u>Scope of consent to search</u>

In his motion to suppress, Lee makes a general assertion that the search of the tractor-trailer exceeded the scope of his consent.  Under the Fourth Amendment, "[t]he standard for measuring the scope of a suspect's consent ... is that of objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida v. Jimeno*, 500 U.S. 248 (1991).  "Although an individual consenting to a vehicle search should expect the search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts, or contents."  *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990); *see also Arizona v. Hicks*, 480 U.S. 321, 324 (1987) (seizure of property occurs when the government intrusion "meaningfully interferes" with individual's possessory interest).  When the justification for the search is based on consent, the Government has the burden of proving that the search was conducted within the scope of the consent received.  *United States v. Ibarra*, 965 F.2d 1354, 1356 n.2 (5th Cir. 1992).  A consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn.  *United States v. Ho*, 94 F.3d 932, 936 (5th Cir. 1996).

In the Fifth Circuit, it is established law that a request to "look in" a vehicle is the equivalent of a request for a general consent to search.  *United States v. Mendoza-Gonzales*, 318 F.3d 663, 667 (5th Cir. 2003), *cert. denied* 538 U.S. 1039 (2003).  By not limiting his response to the general question posed by Fountain if he (Fountain) could "take a look in there [the truck] and search it", Lee essentially gave Fountain a general consent to search the tractor-trailer.  *Id.*

However, when a search is premised upon a general consent, police officers do not have carte blanche over the property.  *Id.* at 669.  The Fourth Amendment still applies and demarcates the outer bounds of the consent.  *Id.*  The question becomes whether it was reasonable to interpret

Lee's general consent to search as authority to remove the speaker in the cab of the truck and look into the void behind them.

A general consent to search a vehicle for drugs justifies a search to include any area where the narcotics may be concealed.  *Florida v. Jimeno*, 500 U.S. 248, 251 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Ross*, 456 U.S. 798, 820-24, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Moreover, the Fifth Circuit Court of Appeals has specifically rejected the contention that a general consent to search does not include consent to search a speaker box located in the trunk of a vehicle. *See United States v. Torrellas*, 197 F.App'x 318 (5th Cir. 2006)(per curiam).  In *United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995), the Fifth Circuit held that a consent to search the defendant's vehicle which specifically included "containers and contents" allowed troopers to unscrew two screws and remove two vent covers in the vehicle, noting that the scope of consent is measured by asking what a reasonable person would have understood by the exchange between the officer and the individual giving consent.[17]  *See also United States v. Zapata*, 180 F.3d 1237 (11th Cir. 1999) (general consent to search allowed officers to search behind interior door panels).

The record reflects that Fountain, after being informed that Lee had a prior arrest for marijuana, asked Lee if he had anything in the truck that he shouldn't have.  Lee responded that he did not have anything.  Fountain requested consent to search and Lee responded "be my guest". From this conversation, Lee (or any reasonable person) should have known that Fountain intended to search for illegal drugs and the search would extend to any area in which the narcotics could be secreted.  In addition, Lee had the opportunity, at least until he was placed in the patrol car, to limit the scope of the search.  There was no evidence or testimony that Lee attempted to limit the scope,

---

[17] The Fifth Circuit found no plain error.  *Id.*

before or after the discovery of the cocaine.

Further, there was no evidence or suggestion that the speakers which were removed by Fountain with the screwdriver or the interior of the tractor-trailer were damaged in any manner. *See Ibarra*, 965 F.2d 1354 (deeming search unreasonable  where agents used sledgehammer to smash open securely boarded-up attic).  Therefore, this Court finds that the scope of the search did not exceed the consent given.

### 2.  Alternate basis: Fountain had probable cause to stop and search.

Under the automobile exception to the warrant requirement, officers may search an automobile if they have probable cause to believe that it contains contraband or evidence of a crime. *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993), *cert. denied* 510 U.S. 1207.  Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed.  *United States v. Carrillo-Morales*, 27 F.3d 1054, 1062 (5th Cir. 1994).

In this case, agents were aware that Miller utilized truck drivers as couriers in tractor-trailers to distribute cocaine from the Houston, Texas area to other parts of the United States.  Agents monitoring the wiretap intercepted conversations between Miller and Lee regarding the transportation of cocaine.  Agents observed Lee meet with Miller and intercepted a conversation between Miller and Johnson regarding cocaine.  Shortly thereafter, Johnson was observed delivering the duffle bags and placing them into Lee's automobile.  Agents later observed Lee place the duffle bag, which appeared to contain items, in his tractor-trailer.  Moreover, after Lee proceeded east on Interstate 10 agents monitoring the wiretap intercepted a call between Miller and Lee wherein Miller inquired if "everything was cool".  Based on the totality of the circumstances, this Court concludes

that the agents involved in this matter had probable cause to believe that Lee was transporting cocaine. *See e.g. United States v. Olvera*, 178 F.App'x. 373 (5th Cir. 2006) (wiretap interception of conversations and surveillance of suspect provided agents with probable cause to stop and search vehicle, including any area where contraband could be hidden).

Once probable cause existed to stop and search the tractor-trailer, the officers were justified in searching the tractor-trailer at the time of the stop without first obtaining a warrant. *See United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996), *cert. denied* 519 U.S. 823 (1996).   Exigent circumstances clearly existed due to the fact that Lee was traveling on an interstate highway. *See United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005).

### E.     Conclusion and Recommendation of the Court

Accordingly, having considered the factors and evidence presented, and based upon the facts and conclusions law stated herein, the undersigned magistrate recommends that the District Court deny Defendant's *Motion to Suppress Physical Evidence* [Clerk's doc. #229].

### F.     Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report.   Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and  recommendations, and from  appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996)

(*en banc*); 28 U.S.C. § 636(b)(1).  The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation.  *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 7th day of May, 2007.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE